Good morning, Your Honors. I'm Richard Osborne. I represent the appellants in this matter. I'd like to reserve at least five minutes for rebuttal, please. Okay. Please watch your time. Thank you. You've been generous with us in terms of briefing lengths. I don't intend to compound the problem by recapitulating the many arguments that you've found in the briefs. What I would like to do, if I may, is help encapsulate and clarify certain arguments and clarify the facts that pertain to them, and then basically violate a basic rule of advocacy and anticipate an argument or issue that may or may not be raised by counsel or the court, and that is whether or not the Hamid case decided by the California Supreme Court with respect to the definition of advertising injury and somehow is implicated in this matter. In our view, it's un- Let me help you just a little bit. All right. Thank you. Assume that we do not accept the basis on which the district court decided this case. Is there an alternative basis for decision at this point? That would sustain the decision? I respectfully suggest no, Your Honor. If you don't accept the applicability of the No Voluntary Payments Clause rationale for the district court's decision, then one is left to look necessarily then at the insuring provisions and at the exclusions in order to determine whether there was any possibility of coverage. And in evaluating that, the first issue that comes to mind is what is the The Upper Deck case, of course, is cited by Transportation for the proposition that its sole obligations of investigation were the four corners of the complaint and that it need not have gone further, and the record is uncontested that, in fact, it did not go further than the four corners of the complaint. But did the complaint allege a claim for advertising related to advertising injury? It alleges facts which cannot be said as a matter of law negate the possibility that advertising could be involved, and I'll explain that in just a moment, because the facts that are alleged are broad enough and ambiguous enough or uncertain enough, one could suggest, as to implicate advertising injury within the meaning of the insurance policy. Before one even gets there, however, the question is, must we? Can we limit ourselves even to the complaint? And I'm going to address your question head-on. I'm not attempting to avoid it at all. In this particular case, not only do we have the general obligations of an insurer to conduct an investigation where the complaint itself creates inquiry notice, and I'm sure that's the import, perhaps, of your question that I intend to address, but we have a specific representation, indeed a promise, that an investigation is undergoing and will continue, and that the insurers will be informed should that continuing investigation indicate that the carrier is inclined to reconsider the status quo, the status quo being that it is not participating in the defense. So this takes this case, in my view, out of the limitations, to the extent there are any, on the general obligation of an insurance company to look beyond the complaint in order to ascertain whether there is possible advertising injury alleged. If we acknowledge that, then it seems to me the analysis is very straightforward and very easy, because it's clear, or at the very least there's a genuine issue as to whether, it's clear that claims were being made, as evidenced by the Osborne letter of October 15th, which were classic advertising injury kinds of claims. It's also clear, based upon the deposition testimony of the A-frame principles, that in fact they were engaging in activities through their website, which involved the misappropriation of our style of doing business. Were you providing the insurance company with all this data that was extraneous to the complaint? Did I? Did anyone? The information that I'm alluding to right now that's extraneous to the complaint was provided to the insurance company, as best I can ascertain, on October 15th. The reason why the information was not previously provided. Was that before or after the denial? That was, the denial letter was October 14th. The exclamation letter was October 15th. They just crossed in the mail. It's clear from the text of the October 15th letter that it was written without any awareness of the fact that this ultimate denial letter was coming in. If they'd had that information, then maybe they could have considered your claims before the denial. Are they supposed to reopen it? I think unquestionably they should have considered or reconsidered the issue of defense with the benefit of the claim. And, of course, they did have the benefit of the claim. They also had the benefit of an offer to rescind the deal altogether. And they didn't, in fact, reconsider. I think what transportation is attempting to do, Your Honor, is shift its own obligation to honor its representation that it would conduct an investigation, shift its own obligation to conduct an investigation, if it's on inquiry notice based upon the language in the complaint, somehow to the insurers. That's simply not the law. And, furthermore, transportation is attempting to do that in a situation where the insurers were reasonably led to believe that the status quo was that they were not being defended, therefore, there was no reason to communicate further with transportation. Yes, but doesn't the insured have some obligation to advise the carrier as to the nature and extent of their business that comes within the framework of the complaint? The insured has the obligation to tender the complaint, which the insured did. And I'm going to address the question in a moment as to what that complaint said and why that's important to this analysis. The insurer did not even know at that point what, if any, problems transportation was having with the complaint and with its analysis. And that's the reason why we have insurance regulations. Under the regulations, transportation, if indeed it was in the process of evaluating whether or not to defend, had certain obligations which it completely ignored, it had the obligation within 30 days to either make its coverage decision or communicate with its insurers in writing as to why it could not. Now, why does that regulation exist? It exists for this very reason that we're now discussing, so that at least the insured knows what the problem is. So that additional information then can be made available to the insurance company. That was not done. In fact, what's interesting about this case, one of the many things interesting about this case, is in the May 29th letter when transportation essentially indicated initially that it couldn't decide whether or not it was obligated to defend. It seems pretty odd, given if their position is just looking at the complaint, we have no duty. That position is odd, and especially since they cannot say, and have not even argued, that the allegations of the complaint specifically negate any possible duty of defense, which is their burden. It's not our burden. It's their burden. All we have to show is a theoretical possibility that we don't even have the burden of an inartfully drafted complaint, because the insurance company, as Montrose says, cannot hide behind the fortress of an inartful complaint. Right now. Now, the complaint alleges the following. If you look at the record, page 186, the excerpts of record, the complaint alleges the following. It alleges at paragraph 24I that the defendants were competing with superpower with regard to the subject matter of the project. Now, what I'm suggesting, by the way, as I'm going through here, is that it's appropriate and necessary to put these all in context, and not just view one in isolation. Next, at paragraph 24X, that defendants competed with superpower with respect to user clients and applications. Okay, this is sounding more and more like a competitive exercise out in the marketplace. At paragraph 31G, and this is important, that the activities of the defendants cause damage to the goodwill and reputation of improper advertising, because that is the effect of advertising, if it's improper, is to impugn reputation and goods and services. And then it goes on to say that as a result of that, superpower lost profits at paragraph 31H, and at 31O, its business operations were interrupted. Now, why would that conceivably and potentially put anyone on notice of the possibility of improper advertising? It's because those things are broad enough to include and encompass improper advertising activities as the vehicle through which those things would have been accomplished. The very uncertitude, and I acknowledge it, obviously this complaint was not drafted for the purpose, specific purpose of implicating insurance. The uncertitude in those allegations, in and of itself, is what cries out for a question. It's a question from the insurance company, because the insurance company cannot look at those allegations and simply say, that cannot be, cannot possibly be advertising injury. In the case cited by Transportation, the insurance company was able to say that, because that allegation based upon RICO and so forth could not be amended without contradiction, and on its face negated any possibility of a covered claim. Now, if we put these allegations, Your Honors, in the context of Transportation's direct promise to investigate, then in that situation, I think it's reasonable to hold Transportation responsible for the consequences of the investigation, had it undertaken one. Well, with the rejection letter, your client settled. Pardon me? With the rejection letter, your client entered into a settlement, right? Well, my client entered into a settlement before the October 14th rejection letter was received, believing that there was no defense in the settlement. What did the insurance contract say with respect to the settlement? Well, the only thing that the insurance contract says about settlement is in the No Voluntary Payments Clause, which I understood I was asked to assume was not implicated and would not, in and of itself, be a basis to sustain the district court's decision. If you'd like me to elaborate on that, I'd be happy to do that. That seems to be where you're going, though, is to go ahead. I'm anxious to know what your question is. You can consider anything that's in the briefing. I just said, assume for a minute the court may not buy that tack. Is there any other tack that the court may not buy? That's all I said at the beginning. I certainly didn't want to bind the court to anything. What could they have learned? That was the question, and it is the question, of course. What they could have learned is what the briefs say, the evidence will show, as to the activity that was taking place. They could have learned that, number one, that Superpower was complaining because they had used their website and misappropriated Superpower's marketing concepts, style of doing business, and ideas. We have to keep in mind that the project, in and of itself, was designed for use in connection with the Internet. And so this kind of activity was particularly onerous insofar as Superpower's, the value of the project to Superpower was concerned. It was being promoted as something that was totally innovative, state of the art. So an advertisement by A-Frame on its website that it was doing this kind of thing would have impugned that basic marketing concept. They would have discovered also the specific allegation that trade secrets inside information were being misappropriated. Now, we know in one of the cases cited, I think it was McLaughlin, but I could be mistaken, the issue was presented whether trade secrets and the misappropriation of trade secrets could constitute advertising under the modern forms. And the court pointed out in that case that the advertising injury concept, which is not defined specifically, advertising not being specifically defined in the new form, was ambiguous in that respect. Because that could, the misappropriation of a trade secret, for example, could include trade dress or could include style of doing business, which clearly would be insured under an advertising injury. The key factor being here, this. It's something that you have to investigate, not only by the basic principles of law, but also by its own representation. If it learns things that I'm just now alluding to, and which you'll find in the October 15th letter and also in the PESC deposition that is cited, it has knowledge of things which I don't know how one could interpret them any other way than constituting advertising injury. Because in some respects, the very language of the policy is tracked. Misappropriation of style of doing business is actually used. Marketing concept is actually used. That language actually appears in the policy. So we have a situation where transportation could have and should have discovered those contentions. Now, if, as a matter of law, you're not able to say that transportation could have and should have, at the very least, one can conclude that that presents a genuine issue to be tried below. We know that transportation agreed to investigate, and I suppose transportation below, if it chooses to take the position, could take the position that if it had made an investigation, this information would not have been revealed to it. But I don't think that transportation gets to make that contention here. That's what trials were for. What this case smacks of, in my view, is a lot of opportunism. We have an insurance company that left a status quo on May 29th, that it was not participating in the defense, and left that commitment open to some possible development that may or may not occur. If transportation had said in that initial letter, we can't evaluate, so we're not doing anything right now, we're going to investigate and we'll get back to you in 30 days, this case would be a different case. If it had complied with the regulations, in fact, this case would have been a different case. But the status quo that was left was that there was no defense. Then the next bastion that transportation wants to take is that A-Frame's attorney, Mr. Adams, sent a letter out of frustration in July, in which he says to transportation, we still haven't heard from you, you haven't gotten back to us, get back to us by August 5th, August 6th, excuse me, transportation then contends the deal was done before August 6th. What is the evidence? The evidence is that they never would have defended anyway, they didn't respond at all, ever, to Mr. Adams' letter, they didn't take any position by August 6th, they didn't take any position until October 14th, as a matter of fact. And then we get to October 14th, which makes it clear and is undisputed that they weren't defending, they wouldn't defend, they never would defend, and now they want to say that in that world, they get off the hook because their insureds did not comply with no voluntary payments provision, which would have protected no legitimate interest of transportation at that point, because it had no interest in doing anything. So even if its insureds should have understood that transportation had not decided not to defend, and that in and of itself is a primal issue of fact, even if they are charged with that understanding or apprehension, even then, nevertheless for transportation to come back later and then say we're off the hook because we never would have defended, but by the way, you entered into an agreement which prejudiced our ability to defend and settle, which we never would have done anyway. That's an idle act that makes no sense whatsoever in my view, and essentially is a form, I think, of sandbagging. If you look at the specific impulse case, which is cited in the brief, it is a case that specifically deals with a computer software business, and as a matter of fact, it's a case which deals specifically with advertising on the defendant's website, and it's a case which deals with the advertising injury issue that the court has framed, and in that specific case, the court held that activity to be an advertising injury within the meaning of the form. Does the court have any other questions about the advertising injury issue? I don't want to pass on that if there are lingering questions. Is this advertising? I alluded earlier to the Hamid case, with which I know that certain members of the panel are very familiar, and what I want to make clear here is not only was there the allegation of claims involving the web and promotion, and we know after Hamid, by the way, Hamid being a case in which the California Supreme Court said that advertising had to be widespread in order to qualify for the advertising injury coverage. It left open the issue of whether marketing to a specific segment would qualify. That issue was later clarified by the California Court of Appeal, which held that the Hamid test could be satisfied. But in this case, we have something unusual. Hamid was construing the standard CGL policy and its coverage with respect to advertising injury. We don't have a standard policy here. In the umbrella in this case, it specifically provides for coverage in those areas which the Hamid court suggested would not have been covered under the standard definition. And this appears at the excerpts of record at page 153 is where this portion of the policy is to be found. It's easily overlooked because the policy in itself is voluminous and in a peculiar organizational format. And what it says in defining advertising injury for purposes of the umbrella is that it applies, quote, regardless of the number or kind of media used, and that it's considered a single occurrence regardless of the frequency of the media used. It's a policy or repetition or number or kind of media used. So essentially, this policy answered the very problem that was addressed in Hamid, and I respectfully suggest for that reason, if anyone is concerned about Hamid, Hamid does not apply to this particular form of policy. Okay. You're over your time, counsel. Good morning, Your Honors. May it please the Court. I would just like to address some items that the Court brought up with Mr. Osborne just moments ago. The first question, I believe, was is there an alternative basis to sustain the district court's ruling? And as is set forth in our brief and as was set forth in our motion for summary judgment, there are numerous other reasons to sustain the district court's ruling. First, there is an exclusion for professional injury or advertising injury. In addition, there is an exclusion for professional services arising out of software development. In this case, the entire contract between Superpower and A-Frame dealt with Superpower's request that A-Frame develop for them software entitled iVision. The CGL policy at issue in this case is not an errors and omissions policy. It is not there to cover the ineptitude of A-Frame. It is there to cover exactly what it says, and none of the things that were alleged by Superpower in the complaint against A-Frame fit within the coverage. In addition, I would urge this Court to look at two prior... But let me ask you something. You said, your client said you were going to investigate and, indeed, things were happening, but you made no effort to investigate or go further beyond the complaint. I don't think that's true, Your Honor. The timeline... No letter, isn't it? The timeline as I understand it is that A-Frame tendered to Transportation at a time when the complaint had not even been served. So at the time of the tender, there was nothing to defend. Transportation said it would investigate and get back to the insured. Between the time that A-Frame tendered and the time that Transportation responded, the complaint had been served, but the insured did not inform the insurance company that the complaint had been served. So the manner of its investigation was still directed merely at the fact that a complaint had been filed. Before Transportation has an opportunity to either accept defense, assuming that there was a defense to be accepted, or decline defense, the insured takes into its own hands the matter of settlement. And, in fact... At that point, did you have a copy of the complaint? Your client? At the time of the tender, a copy of the proposed complaint had been delivered to Transportation. You had a copy of the complaint? Yes. And what did you do? What investigation? Transportation undertook to compare the allegations of the complaint and the policy. And that took how many months? It was tendered in May. Okay. That's fair. But at the time it was given to Transportation, it had not even been served. So Transportation had no expectation that it was in any way inclined to undertake an immediate defense of the insured. There was no defense to be undertaken. And prior to Transportation declining, the insured settled. The insured didn't even give Transportation the time that its attorney did in July. In the July letter to Transportation, they said, you've got until August 6th. Get back to us. And prior to that time, without any further notification, A-Frame settled. Did your client comply with the California regulations in terms of getting back to your insured? We believe that the initial response to the tender saying that we were to investigate does comply with the regulations. At the time, we never had any further notification that there was a defense duty potentially owed. So there was no way that we could have complied. So you're saying you have to have an officially filed complaint before even a potential defense duty would arise? Well, certainly a potential defense duty arose when they learned of the complaint, but no actual duty could arise until there was actually service of that complaint and until the insured was notified that it had been served and that a defense needed to be undertaken. Transportation was never given that right at the time with that information to provide a further response. In addition, Transportation would urge that this Court look very carefully and closely at its prior precedents and its precedents of Faust v. Travelers and the second one, Upper Deck, which was recently decided and which Transportation contends both are totally on all fours in terms of providing precedent for upholding the District Court's ruling. Does the Court have any further questions? Thank you. All right. Thank you, Counsel.
judges: Beezer, Hall, Wardlaw